# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### CIVIL CASE NO. 1:21-cv-00030-MR

BRANDON PICKENS,                      )
                                      )
                 Plaintiff,           )
                                      )     **<u>MEMORANDUM OF</u>**
vs.                                   )     **<u>DECISION AND ORDER</u>**
                                      )
STEVEN HENDRICKS, et al.,             )
                                      )
                 Defendants.          )
_____       )

**THIS MATTER** is before the Court on Defendants Quentin Miller and Western Surety's Motion for Summary Judgment [Doc. 176]; Plaintiff Brandon Pickens' Motion for Summary Judgment [Doc. 228]; and J.D. Lambert, Jeff May, and Katherine Lewis's Motion for Partial Summary Judgment [Doc. 245].

## I.     BACKGROUND

On January 19, 2021, the Plaintiff Brandon Pickens ("Pickens" or simply, "the Plaintiff"), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 addressing a January 20, 2018 traffic stop and strip search involving the Plaintiff and his passenger, Marcus Hyatt. At the time he filed this action,

the Plaintiff was incarcerated on habitual felon and drug charges that are unrelated to the January 20, 2018 incidents.[1]

The unverified Complaint passed initial review on the Plaintiff's § 1983 claims and the Court exercised supplemental jurisdiction over Plaintiff's related North Carolina claims against Buncombe County Sheriff's Office ("BCSO") deputies J.D. Lambert, Jeff May, and Katherine Lewis (the "Deputy Defendants"); against Quentin Miller in his official capacity as Buncombe County Sheriff; and for recovery on BCSO's surety bond against Western Surety Company ("Western").[2]  [Docs. 1, 13]. The Plaintiff seeks actual, compensatory, and punitive damages; a jury trial; and other relief that the Court deems just and proper.  [Doc. 1 at 9].

On August 27, 2019, more than a year and four months before the Plaintiff filed the instant lawsuit, Marcus Hyatt filed a counseled civil rights action in this Court addressing the incidents of January 20, 2018.[3]  See Case No.  1:19-cv-250-MR-WCM ("Hyatt").   Hyatt asserted claims for false imprisonment, false arrest, and assault and battery under North Carolina law

---

[1] The Plaintiff has now been released. [See Doc. 266 (Notice of Change of Address)].

[2] The Complaint also passed initial review against Asheville Police Officer Steven Hendricks, but the claims against him were later dismissed with prejudice.  [Docs. 25, 34].

[3] Hyatt's girlfriend, Ashley Barrett, was detained in a separate vehicle stop on January 20, 2018, as part of the same investigation.  Ms. Barrett was also a plaintiff in the Hyatt civil rights action.

against the Deputy Defendants; claims under § 1983 for unreasonable sexually invasive search against Defendants May and Lambert; claims under § 1983 for unlawful search and seizure against the Deputy Defendants; and a claim for action under the Sheriff's Bond against Sheriff Miller and Western.

Following a multi-day trial, a jury reached a unanimous verdict on several questions, including:

> Did Defendant Lambert see Brandon Pickens' vehicle change lanes without signaling and affect the operation of another vehicle?
>
>     YES
>
> Did Defendant Lambert have reasonable suspicion to stop Brandon Pickens' vehicle?
>
>     YES
>
> Did Defendant Lambert's canine alert to Brandon Pickens' vehicle?
>
>     YES
>     …
> Did Defendant May smell crack cocaine on … Hyatt?
>
>     NO
>
> Did Defendant May find a substance in Brandon Pickens' vehicle that produced a positive field test for cocaine?
>
>     NO….

[Hyatt Docs. 132, 134]. The jury deadlocked on several other questions which the Hyatt parties agreed that the Court could resolve without a jury.

3

Subsequently, the Court found *inter alia* that Defendant May included materially false statements (i.e., that he smelled the odor of crack cocaine and that a substance found inside Pickens' vehicle field-tested positive for cocaine) in a warrant application to strip search Hyatt; that May conducted the strip search in a manner that violated Hyatt's right to be free from an unreasonable sexually invasive search; and that May committed these acts outside the scope of his official authority. [See Hyatt Doc. 142]. The Court found that Hyatt should recover $50,000 from Defendant May on his § 1983 claims for unreasonable search and seizure, and on his North Carolina claims for false arrest/ false imprisonment, and assault and battery. [Id.]. Hyatt's other claims, including his claims on the Sheriff's Bond, were dismissed with prejudice. [Id.]. A Judgment was entered the same day. [Hyatt Doc. 143]. While post-judgment motions were pending in Hyatt, the Plaintiff attempted to intervene in the case, which was denied. [See, e.g., Hyatt Docs. 152, 159].

The instant case was stayed while Hyatt was being resolved. [See Docs. 50, 143]. Once the stay was lifted, the parties filed cross-Motions for Summary Judgment. [Doc. 176: Miller/Western MSJ; Doc. 228: Plaintiff's MSJ; Doc. 245: BCSO Partial MSJ.]. Thereafter, the Court entered Orders in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975),

advising the Plaintiff of the requirements for filing responses to the summary judgment motions and of the manner in which evidence could be submitted to the Court. [Docs. 188, 254: Roseboro Orders]. The parties filed Responses and supporting materials[4] [see Docs. 216, 251, 258, 259: Plaintiff's Resp.; Doc. 248: Miller/Western Resp.; Doc. 249: BCSO Resp.] and Replies[5] [Doc. 260: Miller/Western Reply; Doc. 256: Plaintiff's Reply]. Having been fully briefed, these matters are ripe for disposition.

## II.  STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

---

[4] The Court has considered relevant portions of the record, including the Plaintiff's verified filings, save for those which have been stricken. [See, e.g., Doc. 181 (unauthorized Amended Complaint), Doc. 210 (Response and Declaration that were that were stricken at Plaintiff's request)].

[5] The Deputy Defendants did not file a reply, and the time to do so has expired.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to

the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

<u>Scott</u>, 550 U.S. at 380.

## III. FACTUAL BACKGROUND

The relevant forecast of evidence, viewed in the light most favorable to the Plaintiff, shows the following.[6]

Prior to January 20, 2018, Marcus Hyatt and Ashley Barrett lived together in Candler, North Carolina (the "Residence"), in what law enforcement considered to be a high-crime area. [Doc. 245-3: May Tr. at 4]. Law enforcement received seven complaints of drug activity within a half-mile of the Residence during the months leading up to January 2018. [Id. at 4-5]. Sometime prior to January 20, 2018, an individual contacted the BCSO and spoke to Defendant May about increased vehicle and foot traffic at the Residence. [Id. at 5]. In response to that tip, BCSO members began surveilling the Residence to determine whether any illegal activity appeared to be occurring there. [Id. at 5-6]. Defendant May observed a red car parked outside the Residence; upon investigation, he determined that the license plate on the car had been stolen. [Id. at 8-10]. May also learned that Hyatt had taken the red car for repairs, and that he was once observed sitting in the vehicle for about a minute when it was parked outside his Residence. [Id.].

---

[6] The Court highlights the relevant forecast of evidence and the factual discrepancies between the parties' accounts of the incidents. As for the Plaintiff's Motion for Summary Judgment, the forecasts are taken in the light most favorable to the Defendants.

On January 20, 2018, Defendant May was notified of a new car parked outside the Residence. [Id. at 11]. May ran the new car's tag information in his records management system ("RMS") and learned that the car was registered to the Plaintiff, a "known drug dealer" with over 70 prior charges in Buncombe County including "habitual felon status, a VCI [Violent Crimes Initiative] offender notification,[7] prior charges for robbery, trafficking, possession with intent, cocaine, possession of cocaine, assault, resist/delay or obstruct officers." [Id. at 11]. Defendant May notified the rest of the investigative team of the foregoing, and Defendants Lambert and May drove to the Residence to conduct additional surveillance. [Id. at 12-13].

The Plaintiff and Hyatt left the Residence in the Plaintiff's vehicle and headed towards Asheville. [Doc. 230: Plaintiff's Decl. at ¶ 1]. Defendants May and Lambert followed, with May in a marked patrol car and Lambert in an unmarked car. [Doc. 245-3: May Tr. at 14, 16]. As soon as May's patrol car turned onto the road behind the Plaintiff's car, the Plaintiff slammed on the brakes. [Id. at 14-16]. May turned off the road. [Id.]. Lambert initiated a traffic stop of the Plaintiff's car at a gas station at approximately 12:30 p.m. [Doc. 230: Plaintiff's Decl. at ¶ 2; Doc. 167-5: Lambert First Interrog. 3]. The

---

[7] A VCI notification informs law enforcement of individuals who have committed violent assaults. [Doc. 245-3: May Tr. at 12].

evidence is conflicting as to whether the Plaintiff commited any traffic violation or offense on January 20, 2018.[8]  [Doc. 104-1: Plaintiff's Aff. at ¶ 6; Doc. 230: Plaintiff's Decl. at ¶ 8].  Lambert's vehicle was not equipped with a dashcam and his body worn camera ("BWC") was not activated.  [Doc. 167-5: Lambert First Interrog. 13].  Even if the BWC were activated, it would have been blocked by the dashboard of Lambert's car.  [Id.].

Defendants May and Lewis joined Lambert at the gas station after the traffic stop.  [Doc. 230: Plaintiff's Decl. at ¶ 3].  Lewis looked up the Plaintiff and Hyatt in her RMS and she saw "multiple priors" and drug investigations. [Doc. 245-4: Lewis Tr. at 14-15].  Lewis stood at the passenger side of the Plaintiff's car where Hyatt was sitting, and Lambert was at the driver's side. [Id. at 14].  Lewis observed Hyatt "nervously and rapidly texting on his cell phone."  [Doc. 167-4: Lewis Second Interrog. 14].

Lambert deployed his drug-detecting dog around the exterior of the Plaintiff's car.  [Doc. 230: Plaintiff's Ex at 8].  The Plaintiff watched the dog and saw no "conspicuous indication" of an alert, although the dog was admittedly sometimes out of the Plaintiff's sight.  [Doc. 245-2: Depo. Tr. at 1-

---

[8] Defendant Lambert states that he saw the Plaintiff's car make multiple unsafe lane changes without signaling, and pull out directly in front of another vehicle, and that he also stopped the Plaintiff's car for these infractions.  [Doc. 167-5: Lambert First Interrog. 3].  However, as the Plaintiff denies committing any traffic violations, and because there is no dashcam or body camera evidence depicting the Plaintiff's driving, the Court must accept the Plaintiff's version of the facts as true.

3]. Lambert saw the dog alert to the passenger door seam and to the driver's door handle by rapidly breathing through his nose in those areas. [Doc. 230: Plaintiff's Ex. at 12 (Second RFA 18); Doc. 245-5: Lambert Tr. at 7[9]; see Doc. 245-1: Partial MSJ Memo at 13]. The dog did not perform its final trained response (sitting or lying down) at that time. [Doc. 230: Plaintiff's Ex. at 8 (First RFA 14)].

The Deputy Defendants detained the Plaintiff and Hyatt and collectively searched the Plaintiff's vehicle. [Id. at 6-7 (First RFA 7)]. Defendant Lambert's dog alerted to the interior of Plaintiff's car and performed the final trained response by lying down in the front passenger seat. [Id. at 12 (Second RFA 18)].

At some point during the detention, the Plaintiff was patted down for weapons, but none were found. [Doc. 230: Plaintiff's Decl. at ¶ 4]. The Plaintiff was handcuffed during the vehicle search. [Doc. 245-4: Lewis Tr. at 19; Doc. 230: Plaintiff's Ex at 12 (Second RFA 20)]. Defendant Lewis felt that it would not have been safe for the Plaintiff to be released from handcuffs during the vehicle search, as she observed Hyatt and the Plaintiff engaging in several "preflight indicators," such as looking nervous, shaking, "viciously

_____

[9] The transcript of Lambert's trial testimony is uncertifiable because the court reporter is deceased.

texting," looking at places where they might run, bending over and tying shoes, pulling up pants and tightening belts. [Doc. 167-3: Lewis First Interrog. 10; see also Doc. 167-4: Lewis Second Interrog. 12, 14]. Lewis was certain that there was a high probability that Plaintiff and Hyatt would flee if she did not take precautions. [Doc. 245-4: Lewis Tr. at 18-19].

Officers began the process for obtaining a warrant to search the Plaintiff and Hyatt. The warrant application includes the following information:

> While searching the vehicle Deputy May recovered a substance he thought to be cocaine. May utilized a field test kit to test the substance and the substance tested positive for cocaine.
>
> …
>
> While searching the person of Hyatt Deputy May stated [that] he smelled the odor he knows to be cocaine base crack emitting from Hyatt's person.

[Doc. 230: Plaintiff's Ex at 24-25 (Warrant Application)] (paragraph numbers omitted). May's statements that he smelled crack on Hyatt and that he found a substance in Plaintiff's vehicle that field-tested positive for cocaine are false.[10] [Doc. 63: Plaintiff's Verified Motion at ¶ 9; Hyatt Doc. 132: First Verdict Sheet at 3].

---

[10] These facts were found by the jury to be false in the Hyatt trial.

A warrant was issued to search the Plaintiff at 4:00 p.m. [Doc. 230: Plaintiff's Ex. at 19 (Warrant)]. Defendant May and BCSO Sergeant Stockton escorted the Plaintiff into the gas station's convenience store bathroom and strip searched him at 4:05 p.m. [Doc. 230: Plaintiff's Decl. at ¶ 5]. The officers did not discover any drugs or other contraband on the Plaintiff's person. [Id. at ¶ 3]. The Plaintiff was then allowed to leave, roughly 3 ½ hours after the initial stop. [Id. at ¶ 7]. Neither the Plaintiff nor Hyatt was charged with a drug offense as a result of the traffic stop. [Id. at ¶ 3]. However, Defendant May gave the Plaintiff a traffic citation for committing the following infractions at 2:00 p.m. on January 20, 2018:

> OPERATE A MOTOR VEHICLE ON A STREET OR HIGHWAY BY FAILING TO SEE BEFORE TURNING FROM A DIRECT LINE THAT SUCH MOVEMENT COULD BE MADE IN SAFETY. NOT USING A TURN SIGNAL FOR THREE DIFFRENT [sic] LANE CHANGES, ONE OF WHICH WAS MADE IN FRONT OF ANOTHER VEHICLE. (G.S. 20-154)

[Id. at ¶ 7; Doc. 230: Plaintiff's Ex at 26 (Citation)]. The Plaintiff pleaded not guilty and told the District Attorney that he had been detained by officers at the time when the infractions allegedly occurred. [Doc. 230: Plaintiff's Decl. at ¶ 9]. The District Attorney subsequently dismissed the traffic citation. [Id. at ¶ 10; see Doc. 230: Plaintiff's Ex. at 27].

Jack Van Duncan was the Buncombe County Sheriff between December 4, 2006 and November 30, 2018. [Doc. 176-2: Duncan Decl. at

¶ 1].  He was responsible for overseeing law enforcement operations, personnel matters, and policies for the BCSO.  [Id.].  While Duncan was Sheriff, all sworn deputy sheriffs were required to successfully complete the NC Basic Law Enforcement Training ("BLET") curriculum promulgated by the North Carolina Sheriff's Education and Training Standards Commission.  [Id. at ¶ 4].  All sworn deputies also completed annual in-service training mandated by the Commission.  [Id. at ¶ 5].  The Deputy Defendants had completed BLET and were up-to-date on their annual in-service training on January 20, 2018.  [Id. at ¶¶ 6-7].

Sheriff Duncan adopted numerous policies regarding law enforcement operations to ensure compliance with federal and state laws and to provide guidance when dealing with difficult situations.  [Id. at ¶  8].  These policies address, *inter alia*: BWCs [Doc. 176-3]; vehicle stops [Doc. 176-4]; searches [Doc. 176-5]; transporting prisoners [Doc. 176-6]; and K9 operations [Doc. 176-7].  All sworn deputies were required to review the policies and to follow them; failure to do so could result in discipline, including termination.  [Doc. 176-2: Duncan Decl. at ¶ 9].  On January 20, 2018, there was no policy, custom or practice within the BCSO that permitted deputy sheriffs to violate the constitutional rights of any person, and Duncan approved no such policy while he was Sheriff.  [Id. at ¶ 16].  Duncan was not aware of a problem

involving deputies making traffic stops without reasonable suspicion and searches of individuals without probable cause except as authorized by Policy regarding Terry[11] searches and consent searches.  [Id. at ¶ 15].

On January 20, 2018, a $20,000 Sheriff's Bond with Western was in effect.  [Doc. 176-8: Houston Decl. at ¶¶ 4-5].  Buncombe County additionally purchased law enforcement liability coverage for wrongful acts by BCSO with a retained limit of $500,000.  [Id. at ¶¶ 10, 13-14; see Doc. 176-10].  BCSO has not waived governmental immunity for state claims for a judgment exceeding $20,000 and under $500,000.01.  [Doc. 176-8: Houston Decl. at ¶ 19].

The Plaintiff and Hyatt complained to BCSO about the January 20, 2018 incidents.  [Doc. 249-2: Plaintiff's Depo. at 5-6].  A BCSO administrative investigation found no policy violations or illegal activity by any BCSO employees.  [Doc. 216-1 (March 13, 2018 Hilliard Letter)].  The Plaintiff and Hyatt then considered suing in federal court.  The Plaintiff was contemplated as a plaintiff in the Hyatt case; however, Hyatt chose to proceed without him due to concerns that the Plaintiff's drug involvement and incarceration could harm Hyatt's case.  [Doc. 249-3: Hyatt Depo. at 5-6].  The Plaintiff therefore filed this action separately and *pro se*.

---

[11] Terry v. Ohio, 392 U.S. 1 (1968).

## IV. DISCUSSION

### A. Deputy Defendants' Motion for Partial Summary Judgment

The Plaintiff brings claims against the Deputy Defendants under §
1983 for violations of his Fourth Amendment rights, assault and battery, false
arrest and false imprisonment, and trespass to property with regard to the
traffic stop, his detention, the searches of the Plaintiff's vehicle and personal
property, and ultimately his strip search. [Doc. 1]. The Deputy Defendants
move for summary judgment on all of these claims except for those arising
out of the strip search, i.e., whether the strip search was justified, whether it
was conducted in a reasonable manner, and whether the Plaintiff is entitled
to damages arising from it. [Doc. 245-1 at 2].

The Deputy Defendants first argue that the traffic stop of Plaintiff's car
was justified – independent of the disputed traffic infractions – by: (1) a
reasonable suspicion of drug activity; and (2) probable cause to believe that
an occupant of the vehicle was in possession of stolen property, i.e., the red
car. [Doc. 245-1: Partial MSJ Memo at 2]. They further argue that only
Defendant Lambert, and not Defendants May and Lewis, were involved in
the initial stop of the Plaintiff's vehicle.

A traffic stop constitutes a seizure under the Fourth Amendment and
must be justified by reasonable suspicion of criminal activity or some other

16

exception to the generally applicable warrant requirement. <u>United States v. Feliciana</u>, 974 F.3d 519, 522 (4th Cir. 2020). "[A] police officer can, consistent with the Fourth Amendment, conduct a brief, investigative stop (i.e., a <u>Terry</u> stop) predicated on reasonable, articulable suspicion that criminal activity may be afoot." <u>Milla v. Brown</u>, 109 F.4th 222 (4th Cir. 2024) (internal quotations and citations omitted). An officer with reasonable suspicion has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>Kansas v. Glover</u>, 589 U.S. 376, 380 (2020) (citing <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)). Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996) (citation and internal quotation marks omitted). To support a finding of reasonable suspicion, the detaining officer must "either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." <u>United States v. Foster</u>, 634 F.3d 243, 248 (4th Cir. 2011). Accordingly, "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist." <u>United States</u>

v. McCoy, 513 F.3d 405, 413 (4th Cir. 2008). Courts look to the totality of the circumstances in determining whether an officer had reasonable suspicion of criminal activity. United States v. Arvizu, 534 U.S. 266, 273 (2002). When considering the totality of the circumstances, the Court "must not overlook facts that tend to dispel reasonable suspicion." United States v. Drakeford, 992 F.3d 255, 258 (4th Cir. 2021).

An arrest is a seizure under the Fourth Amendment, and such a seizure is reasonable only if based on probable cause. Wilson v. Kittoe, 337 F.3d 392, 398 (4th Cir. 2003). Probable cause requires a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238 (1983). Whether probable cause exists must be determined "in the light of all of the surrounding circumstances." Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir. 1998).

Here, the Deputy Defendants have not provided any concrete indication that the Plaintiff or Hyatt were engaged in criminal activity. Although the deputies had received a tip about increased foot traffic and unfamiliar vehicles at the residence, that tip provided no additional indications of drug trafficking, such as the identity of those visitors, the length of the stops at the Residence, or the presence of a drug odor. United States v. Velazco-Duranzo, 372 F.Supp.2d 520, 529 (D. Ariz. 2005) (explaining that

police officers lacked reasonable suspicion based on a tip from neighbors who "reported seeing only three or four different vehicles, and the police had no information as to whether the people coming and going were residents, family members, frequent visitors, or strangers."). The Plaintiff's application of his brakes upon seeing a marked patrol car pull behind him also is no indication of criminal activity, because that conduct is common among the general law-abiding public. See McCoy, 513 F.3d at 413; see also United States v. Massenburg, 654 F.3d 480, 491 (4th Cir. 2011) (explaining that if "the ordinary response of the innocent … sufficed to create reasonable suspicion, then [the] reasonable suspicion requirement would become meaningless").

The forecast of evidence that the Plaintiff's passenger, Hyatt, may have owned or otherwise possessed a red car with stolen tags does not add appreciably to this analysis. The Plaintiff and Hyatt were not driving the red car at the time of the traffic stop. See generally United States v. Foster, 634 F.3d 243, 247 (4th Cir. 2011) (a person's Fourth Amendment rights cannot be lessened simply because he is "under investigation" by police); compare United States v. Wheeler, 317 F.App'x 298, 299 (4th Cir. 2008) (holding that there was no constitutional error with stopping and searching a car when officers had a reasonable suspicion that the car being driven *at that time* was

stolen); Wilkinson v. Maese, No. 1:20-cv-783-MIS, 2021 WL 5416250, at *5 (D.N.M. Nov. 19, 2021) (holding that possession of a stolen vehicle was sufficient to establish probable cause because the vehicle was indisputedly in the plaintiff's sole possession and plaintiff admitted that he had been driving it). Moreover, there is no forecast of evidence that the red car was stolen, only that the tag had been reported stolen, and the Defendants had no information to suggest that Hyatt himself was responsible for the stolen tag.

Because there are genuine issues of material fact as to whether Defendant Lambert had probable cause or a reasonable suspicion to stop the Plaintiff's vehicle, the Court cannot determine the legality of the traffic stop on summary judgment. See Fridley v. Horrighs, 291 F.3d 867, 872 (6th Cir. 2002) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible."). Summary Judgment will, however, be granted to Defendants May and Lewis on this claim because the undisputed forecast of evidence demonstrates that it was Defendant Lambert alone who initiated the traffic stop.

Even so, the Deputy Defendants argue that Defendant Lambert is entitled to qualified immunity on the Plaintiff's claims for initiating the traffic

stop and that all of the Deputy Defendants are all entitled to qualified immunity for the claims arising from the detention and searches that followed.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Smith v. Ray, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted). An award of qualified immunity is inappropriate if a question of material fact exists that, when resolved, would amount to the violation of a clearly established constitutional right. See Quinn v. Zerkle, __ F.4th __, 2024 WL 3610110, *4 (4th Cir. Aug. 1, 2024); Ray v. Roane, 948 F.3d 222, 228 (4th Cir. 2020) (citing Smith, 781 F.3d at 100).

It is clearly established under the Fourth Amendment that individuals have the right to be free from unlawful searches and seizures, including traffic stops that are not justified by probable cause or a reasonable suspicion. Hicks v. Ferreyra, 965 F.3d 302, 307 (4th Cir. 2020). Because the forecast of evidence presents genuine disputes regarding whether Defendant Lambert had a reasonable suspicion or probable cause to support the traffic stop, the Court cannot determine at the summary judgment stage whether a constitutional violation occurred with regard to the traffic stop. Accordingly, the Defendant Lambert's request for summary judgment based on qualified immunity in initiating the traffic stop must be denied. Christian v. Payne, 748 F.App'x 504, 506 (4th Cir. 2018) (stating that a "genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred must be reserved for trial") (citing Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006)).

The Court also cannot determine as a matter of law whether the Deputy Defendants are entitled to qualified immunity as to the Plaintiff's claims that are based on incidents that followed the initial traffic stop. The parties present conflicting forecasts of evidence regarding significant events leading up to and during the traffic stop, including the reasonableness of the length of the detention and the justification for handcuffing the Plaintiff and for

searching him and his vehicle. If Defendant Lambert's initial stop was not supported by probable cause or a reasonable suspicion, the Plaintiff's continued detention and the subsequent searches would also be unlawful. See Johnson v. Anhorn, 416 F.Supp.2d 338, 359 (E.D. Pa. 2006); Muir v. Danner, No. 2:19-cv-00013, 2020 WL 4727072, at *5 (M.D. Tenn. Aug. 14, 2020), appeal dismissed, No. 20-5937, 2020 WL 6742325 (6th Cir. Sept. 16, 2020).

Because there are numerous factual issues regarding the Deputy Defendants' actions during the traffic stop, the Court cannot grant them summary judgment based on qualified immunity as to the Plaintiff's claims regarding the traffic stop, the Plaintiff's detention, and the subsequent searches.

The same genuine disputes of material fact that exist regarding the Defendants' alleged violations of the Plaintiff's Fourth Amendment rights also preclude the Court from granting summary judgment for the Deputy Defendants on the Plaintiff's North Carolina claims. See, e.g., Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994) (the parallel state law claim of assault and battery is subsumed within a federal excessive force claim and goes forward as well if the federal claim survives summary judgment).

Accordingly, the Deputy Defendants' Motion for Partial Summary Judgment is granted for Defendants May and Lewis as to the initial traffic stop, but it is denied in all other respects.

### B.    Miller/Western's Motion for Summary Judgment

The Plaintiff asserts state law claims against Sheriff Miller in his official capacity and a claim against Western Surety on the Sheriff's surety bond, as well as § 1983 claims under a theory of municipal liability.  Defendants Miller and Western seek summary judgment because the Plaintiff has failed to forecast sufficient evidence to support a § 1983 claim, and because Defendant Miller has not waived his governmental immunity for the North Carolina tort claims exceeding $20,000.00 and under $500,000.01. [Doc. 176-1].

Suits against sheriffs in their official capacity are in substance claims against the office of the sheriff itself.  Gannt v. Whitaker, 203 F.Supp.2d 503, 508 (M.D.N.C. Feb. 26, 2002).  To succeed on such a claim, a plaintiff must allege that a Sheriff's Office policy or custom resulted in the violation of federal law.  See Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694 (1978) (holding that in an official capacity suit, the entity's "policy or custom" must have played a part in the violation of federal law); Oklahoma City v. Tuttle, 471 U.S. 808, 818-20 (1985) (discussing same).  A plaintiff can

establish the requisite "policy" through a failure to train, if it "reflects a 'deliberate' or 'conscious' choice" to not do so.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989).  Proof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>, "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  <u>Tuttle</u>, 471 U.S. at 823-24.  In order to succeed on his official capacity claims, therefore, the Plaintiff must not only prove the deprivation of a constitutional right, but also that acts of a final decisionmaker caused the Plaintiff to be subjected to such deprivation.

Here, the forecast of evidence demonstrates that BCSO deputies were required to successfully complete training before being hired, complete in-service training annually, and comply with BCSO written policies; that the Deputy Defendants completed BLET training and annual in-service training; that there was no policy, custom or practice within BCSO that permitted deputy sheriffs to violate the constitutional rights of any person; and that Sheriff Duncan was not aware of deputies searching individuals without probable cause (except pursuant to policies that do not apply here).

While the Plaintiff states in Declarations that the Defendant Deputies implemented an unwritten BWC policy that allowed them to conceal their

violations of the Plaintiff's rights on January 20, 2018, [Docs. 257-1, 258-1: Plaintiff's Decls.], the Plaintiff's forecast of evidence that the Deputy Defendants used the unwritten BWC policy to conceal misconduct on a single occasion fails to show the existence of a municipal custom or policy. See Tuttle, 471 U.S. at 823-24. Moreover, the Plaintiff has not presented a forecast of evidence attributing the unwritten BWC policy to a final policymaker. As noted previously, the forecast of evidence demonstrates that Sheriff Duncan enacted no such policy and was unaware that deputies were violating individuals' constitutional rights.

The Plaintiff now argues that Sheriff Duncan ratified the Deputy Defendants' wrongdoing by approving Hilliard's administrative investigation finding that no policy violations or illegal activity occurred, and that this gives rise to Monell liability. [See Docs. 216, 232]. Even if the Plaintiff had presented a forecast that Sheriff Duncan had approved Hilliard's finding, such after-the-fact approval could not have caused the Plaintiff's alleged injury. See Franklin v. City of Charlotte, 64 F.4th 519 (4th Cir. 2023) (holding that City Manger's post-facto approval of an internal investigation finding no wrongdoing in plaintiff's shooting death could not "undo" a constitutional violation and, thus, it was not traceable to a final policymaker's action).

26

Defendant Miller will, therefore, be granted summary judgment on the Plaintiff's Monell claims.

Defendants Miller and Western further argue that Miller has not waived governmental immunity for North Carolina tort claims exceeding $20,000 and under $500,000.01. [Doc. 176-1: Miller/Western MSJ Memo at 14-17]. The Plaintiff agrees. [Doc. 216: MSJ Response at 1]. Accordingly, summary judgment is granted on the Plaintiff's surviving official capacity state tort claims exceeding $20,000 and less than $500,000.01.[12]

Finally, Defendants Miller and Western argue that the Plaintiff's recovery on any surviving claims should be limited to the amount of the bond, without the ability to sue repeatedly on the bond. [Doc. 176-1: Miller/Western MSJ Memo. at 17; see Doc. 1: Compl. at ¶ 76 (Plaintiff seeks to "sue repeatedly on the bond until the judgment is paid")]. North Carolina Gen. Stat. § 58-76-5 states that "[e]very person injured by the neglect, misconduct, or misbehavior in office of any ... sheriff ... may institute a suit or suits against said officer or any of them and their sureties." A plaintiff's damages are limited to the extent to which the claims are covered under the bond purchased. White v. Cochran, 229 N.C. App. 183, 190, 748 S.E.2d 334, 339

---

[12] Had the Plaintiff had not conceded this point, the Court would have granted summary for the reasons discussed by the Defendants. [See Doc. 176-1 at 14-17].

(2013). To the extent that the Plaintiff may recover damages against the Sheriff, his recovery will be limited to the amount of the bond. See Morgan v. Spivey, No. 5:16-cv-365, 2019 WL 81480, at *22-23 (E.D.N.C. Jan. 2, 2019) (collecting cases).

For the foregoing reasons, the summary judgment is granted for Defendants Miller and Western as discussed in this section.

### C. Plaintiff's Motion for Summary Judgment

The Plaintiff argues that he should be granted summary judgment on all of his claims pursuant to collateral estoppel, and that the case should proceed to trial solely on damages. [Doc. 228 Plaintiff's MSJ; Doc. 229: Plaintiff's MSJ Memo at 15]. Specifically, he argues that the following determinations in Hyatt are binding on the parties in the instant action: (1) that the "entire traffic stop" was unconstitutional because no there was no lawful basis for Lambert to stop him, as demonstrated by the time variance between the alleged infraction (12:30 p.m.) and the time noted in the traffic citation (2:00 p.m.) [Doc. 229 at 11-15] and (2) that Defendant May violated the Fourth Amendment with regard to the strip search by including false material statements in the search warrant application [id. at 9-11].

Issue preclusion, sometimes called collateral estoppel, precludes a party from relitigating an issue actually decided in a prior case and necessary

to the judgment. Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc., 590 U.S. 405, 411 (2020). Issue preclusion applies when later litigation arises from a different cause of action between the same parties. In re Varat Enters., Inc., 81 F.3d 1310, 1315 (4th Cir. 1996) (citing Allen v. McCurry, 449 U.S. 90, 94 (1980)). Issue preclusion operates to bar a party from "relitigating an issue actually decided in a prior case and necessary to the judgment." Lucky, 590 U.S. at 411. For issue preclusion to apply, the proponent must establish that:

> (1) the issue sought to be precluded is identical to one previously litigated; (2) the issue must have been actually determined in the prior proceeding; (3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; (4) the prior judgment must be final and valid; and (5) the party against whom estoppel is asserted must have had a full and fair opportunity to litigate the issue in the previous forum.

Sedlack v. Braswell Servs. Grp., Inc., 134 F.3d 219, 224 (4th Cir. 1998). Offensive collateral estoppel occurs when a plaintiff employs the doctrine of collateral estoppel to foreclose a defendant from litigating an issue that the defendant previously litigated in an action with another party. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.4 (1979). There is a greater possibility for unfairness from the use of offensive collateral estoppel, and district courts are granted "broad discretion to determine when it should be

29

applied." In re Microsoft Corp. Antitrust Lit., 355 F.3d 322, 326 (4th Cir. 2004). This discretion should not be exercised to permit the use of offensive collateral estoppel "where a plaintiff could easily have joined in the earlier action or where … the application of offensive collateral estoppel would be unfair to a defendant…." Id. (listing additional nonexclusive factors) (quoting Parklane Hosiery Co., 439 U.S. at 326 n.4).

As to the traffic stop, collateral estoppel does not apply to Defendant Lambert's alleged lack of reasonable suspicion for the traffic stop or to the alleged illegality of the Plaintiff's entire detention because no such final determinations were reached in Hyatt. In making this argument, rather than trying to apply any final judgment in Hyatt, the Plaintiff attempts to apply the Court's *summary judgment conclusions* in that prior case that several issues of material fact existed. [See Doc. 229 at 7, 8]. However, the ultimate conclusions that were reached in the Hyatt case found, to the contrary, that the traffic stop and detention were justified, as discussed *supra*. See Hyatt v. Miller, No. 1:19-cv-00250-MR-WCM, 2022 WL 3130108, at *2 (W.D.N.C. Aug. 3, 2022). Accordingly, the Plaintiff's attempt to rely on collateral estoppel with regard to the legality of the traffic stop is rejected.

As to the conclusion that Defendant May violated the Fourth Amendment with regard to the strip search of Hyatt, this conclusion has no

bearing on the constitutionality of May's actions with respect to the strip search of the *Plaintiff*, as they were two separate searches. Even if the Plaintiff had been a party to the <u>Hyatt</u> litigation, the issue of the constitutionality of the search performed on him would have been submitted to the jury separately, and the jury would have had to determine whether the particular circumstances of the Plaintiff's search were constitutionally permissible. The Court, therefore, declines to permit the use of offensive collateral estoppel against Defendant May in the instant case. The Plaintiff's collateral estoppel arguments are, therefore, denied.

Insofar as the Plaintiff seeks summary judgment on his remaining claims, this is also denied. There are genuine disputes of material fact regarding the legality of the initial traffic stop and of the detention and searches that followed as discussed *supra*. Accordingly, the Plaintiff's Motion for Summary Judgment on those claims is also denied.

## V.   CONCLUSION

For the reasons stated herein, the Court grants in part and denies in part the Deputy Defendants' Motion for Partial Summary Judgment, grants Defendants Miller and Western's Motion for Summary Judgment, and denies Plaintiff's Motion for Summary Judgment. The parties will be required to

notify the Court whether they object to a judicial settlement conference in this matter.

## <u>ORDER</u>

**IT IS, THEREFORE, ORDERED** that:

1. Defendants Quentin Miller and Western Surety's Motion for Summary Judgment [Doc. 176] is **GRANTED.**

2.  Plaintiff Brandon Pickens' Motion for Summary Judgment [Doc. 228] is **DENIED.**

3. Defendants J.D. Lambert, Jeff May, and Katherine Lewis's Motion for Partial Summary Judgment [Doc. 245] is **GRANTED IN PART AND DENIED IN PART**.  Specifically, the Motion is **GRANTED** as to Defendants May and Lewis with respect to the basis for the initial traffic stop.  The Motion is **DENIED** with respect to the Plaintiff's claims related to the initial traffic stop by Defendant Lambert, as well as his continued detention and the subsequent searches of his vehicle and his person by Defendants Lambert, May, and Lewis.

4. The parties shall notify the Court within **fourteen (14) days** of this Order whether they object to a judicial settlement conference in this matter.

**IT IS SO ORDERED.**

Signed: September 12, 2024

Martin Reidinger
Chief United States District Judge